Good morning, Your Honors. My name is Morgan Russell. I represent Petitioner Malak Manes. This is a review of an adverse credibility determination by the immigration judge that the BIA affirmed. This is a post Real ID Act case, so any defect or inconsistency in the testimony did not have to go to the heart of Mr. Manes's claim, but it did have to bear a legitimate nexus to his credibility. It could not be based on speculation or conjecture, and among other things, had to actually be supported by some evidence in the record. Here, the BIA adopted five of the IJ's bases, or supposed bases, for her adverse credibility determination. I think four of them are clearly nonsensical and speculative or baseless. I think the only kind of conceivable way the Court could affirm this or deny the petition for review would be on the demeanor finding. Roberts. Well, okay. So you four of them, you say are just ridiculous. Malak Manes I'll come back to those. Roberts. I have a couple of them that I thought got past the ridiculous threshold. Malak Manes But I'll start with demeanor. So the IJ said that there was four concerns she had about demeanor. One, that he moved his hands so much at an unspecified time during his testimony that they made noise. One, that he was non-responsive and gave rambling answers. One, that these were all sort of supposedly things that happened on cross-examination that didn't happen on direct. That his speech got faster and his tone in Punjabi, which is a tonal language, became desperate, according to her recollection. And that at some point he repeated things and it gave her the impression he had memorized his declaration. I think two of these are things that the Court can and should, under this Court's case law, look back at the transcript to see if the transcript, I think all of them the Court has to look back at the transcript. Two of them are things that the transcript sort of clearly shows to not be true. There is no instance on cross where he is non-responsive or gives long rambling answers. I don't think the government identified any in their brief. I don't see any going through the transcript. The IJ didn't identify where on the many, many pages and the cross was much longer than the direct. She didn't identify anything in her decision two weeks after the hearing as to where this happened. It seems like she misremembered something about an allegation that the original DHS counsel made about him having memorized dates from the declaration. That's at page 200 of the record. In fact, the interpreter explained that he had misstated the question and thought that DHS counsel had asked for all three dates of the three incidents. So that leaves the IJ's choice in some way that was suggestive of nervousness. But I think under this Court's case law, even those kind of non-verbal communications, the IJ is expected to make some reference during the hearing if something like that is going on. I don't see, that doesn't seem to me to be realistic, right? The IJ is going to give a running commentary on her I don't think it's unrealistic at all, and I think it's what this Court has said. So the person, sir, I notice that you are now moving your hands in a way that you didn't  I think it's honestly, I think in a trial with a audio recording that's going to be transcribed, it's what everyone is expected to do. So in this hearing... I've never seen a judge make a comment on a witness's change in demeanor between direct and cross in the middle of the cross. And I don't think you've ever seen that either. Well, I have seen it, and I've, and... Can I ask when? What's that? Yeah, well, I've seen it, and this Court has seen it. What trial were you in where you saw that a judge make a comment during the middle of cross-examination on someone's demeanor? Two things. So in this case, in the record at page 201, the IJ notes that he's pointing to his left hand when he's pointing to his left hand to show where the scar is. I think that's the kind of thing that's very common to happen. What does that have to do with demeanor? It has to do with identifying verbally into the record, something that's notable that is happening non-verbally. Yeah, I hear you, distances, gestures, but... Demeanor commentary, I've just never seen that. Well, I have, and this Court has seen it also. In this Court's 2014 post-real ID case in Huang, H-U-A-N-G, 744 F. 3rd, 1149, this case ends up coming out the other way but only because the transcript itself actually reflected non-verbal indications that supported the IJ's sort of later assertion about demeanor. The record showed that the person wasn't doing something? Right. So, I mean, there it was kind of even more helpful to the IJ because the transcriber had actually written in, kind of in brackets, no audible response on several things. But there's a point where the IJ also says, you know, takes an aside and says, I just want to note for the record that there was a long pause before he answered and that's happened several times now. And so I'm saying, I do see that regularly in immigration court. It happened in Huang. You see that in a district court, did you say, or the immigration court? In immigration court. Yes, that's because of our cases. But when a judge is required to determine who's lying or not lying, there's no real test. It's like you, when you talk to a client, you see things, you feel things, that their eyes are going back and forth or whatever. But you make a determination how much you believe them. I thought that there was, this record was pretty good, that we were getting something anyway. Ordinarily, a judge doesn't make any comments about why they do it. At least she had, the IJ here had something. We don't expect perfection out of the truth finder. We expect them to do their job. But we don't expect a full rendition of why each reason I saw the person blink or they were looking down or they were looking at their lawyers. What can we expect? What kind of a record do we require to determine whether the judge is correct or not? We weren't there. The judge was. Well, I think you said it yourself. Under your cases, this is an expectation. And it doesn't have to be a lot. But especially where the IJ is going to make, issue a decision, oral decision two weeks later after hearing many other cases in the interim, I do think that this Court's cases, like you said, require this. And I think Wong is a good example that shows what is enough. Some indication by the IJ in the record, just like an attorney who wants to record for the transcript some nonverbal thing that's happening out of earshot of the recorder, will be expected to do the same. So I guess I'll leave it there for demeanor. I do want to go to the border interview issue. I know this Court's cases go kind of both ways on whether something like this can be deemed reliable and used. It depends on the circumstances. I think here there's no basis for the IJ to disregard or find implausible his super consistent and plausible account of being exhausted when this interview happened and being in a sleep-deprived daze. It's undisputed between the parties that he was detained in the evening on February 13th. The interview happened sometime before 5 a.m. on the 14th. He said he was kept in a cold cell overnight, which is something the Border Patrol still does when they apprehend people. And his account is totally consistent from the time of— his account of that time period of when he was brought to the border on the Mexican side is consistent from the border interview to the credible fear interview. But from the record itself, it shows that from the time of the beginning till the time he was, this time in which he was getting charged, it was 11 hours. Ordinarily in 11 hours, if you're tired, you can nod off. And there's nothing in the record saying that they kept bright lights on or kept talking to him. Well, it does say he was kept in a cold cell and couldn't sleep for that reason. And that's something that still goes on and is a real thing. And there's nothing for—there is no basis to disregard that because his account is really consistent from the— Well, we don't have anything in the record as to whether it's still going on. All we have is the record of this one occasion. But there's no reason to disregard it on this one occasion unless there's something implausible about his account of this period. 11 hours later. Right, but if you've ever booked or been familiar with the booking process in any kind of detention situation, it's— I'm very familiar with it, but I only use the record in front of me because that's my duty. Right, right. Well, you know, your time is just about up. Let me ask you about one of the other ridiculous bases for the IJ's adverse credibility finding, the inconsistencies with the documents that he himself submitted. That didn't strike me as ridiculous. It seemed—I don't know why he bothered even bringing these documents to introduce inconsistencies that he didn't need to. Maybe you can address that. So I could see sort of that there's oddities or weaknesses in some of these documents, but I don't see how they go to his credibility. In terms of the medical letter that refers to his arm, there is no basis to—it would have been purely— it could only be speculation for the IJ to disregard that as something that's not the case in Punjabi. And the IJ can't speculate in that way. I mean, even in English, the hand is part of the arm. And I note that in the record, in his declaration at AR-316, in his father's affidavit at AR-284, and in the IJ's own decision at AR-71, she does the same thing and uses them interchangeably. Was the record they looked at in Punjabi or English? What's that? The medical record of the doctor. Well, the doctor's note was written in English. In English. That's what I thought. Right. But, you know, whether—but it's in his second language. And so, you know, why he—I think it's speculative that he wouldn't or would or would not carry the same practice over into his second language. And I'll—I can address the rest on rebuttal. Okay. Great. We'll hear from the government. Good morning, Your Honors. May it please the Court, Andrew Nsinga on behalf of the Attorney General. What petitioner is asking this Court to do is require, as Your Honor pointed out, a running commentary of demeanor and responsiveness as the aliens testifying. Let's be blunt. If this Court required or if the immigration judge had done this in this case, what would we be talking about? Due process. How dare an immigration judge interrupt my client during testimony? Sir, why are you fidgeting? Sir, why is your tone changing? Sir, what are you doing? This is not what judges do, whether in a district court judge or an immigration judge. To require that to do that would simply make these proceedings a farce. Well, I think the point is I don't think our cases require that, contrary to what counsel has represented. I think they do require after the fact for the I.J. to say something other than I just found the person's demeanor to be suggestive of the line. You have to be specific in what the particulars are. And I think that's what Judge Wallace was saying. Here we actually have a little bit more than we typically see. Yes, exactly, Your Honor. Because what we have is exactly what Singhower is. On direct, he's telling what is, in the agency's opinion, a memorized story. He has an attorney. He's telling his little story. On direct, on cross-examination, now he's getting challenged about his story. Well, cross was longer. Well, that's because there's a lot of doubts about credibility because we have demeanor, responsiveness, and discrepancies in documents. So the immigration judge says, well, look, direct, you're fine. Cross, you start fidgeting. You start doing things. Your tone of voice is changing. Well, that's exactly what Singhower said was acceptable pre-Real ID Act. Post-Real ID Act, what Congress did was strengthen the agency's ability to make adverse credibility determinations. It swept away, with all due respect, much of this Court's case law about heart of the heart. It said let the immigration judge act like a fact finder in district court. Let the immigration judge sit there and look at the alien and assess credibility. Like Your Honor pointed out, when an attorney meets with a client, you interact. You understand, do I trust this person? Do I believe this person? This is what fact finders do. Now, the government has to point out, with all due respect, that Petitioner's court, Wong, is not in their briefs. If Petitioner would like to cite that case, the government would ask that a 28J be filed so the government can address the case. But otherwise, we're not only dealing with, as Your Honor pointed out, the record before the court. If Petitioner or counsel would like to testify, then that's a different matter. But what we're dealing with here is the record. And with all due respect, if we're going to deal with actual records or personal opinions, I've never seen a case, and I don't know this court ever has, where an immigration judge says, sir, stop fidgeting. Sir, stop doing this. Sir, why are you doing that? It would make a mess. It would undermine the alien's ability to testify. What's the standard review that we use for the board determination on credibility? On credibility, the record must compel reversal. No reasonable fact finder would have to agree with this determination or, put as the to overturn adverse credibility determination. It must be an extraordinary circumstance. But what we have here alone, and Petitioner concedes this essentially now, is demeanor. The demeanor is on the record. The demeanor comports exactly with Singhower. And we add in the other concerns, nonresponsiveness. Now, Petitioner says that the government hasn't pointed it out. The government did point out in Petitioner, in our brief, that page 172 and 173. Now, Petitioner wants to deal with the substance of the board interview. But here we're dealing with nonresponsiveness. The Department of Homeland Security is trying to establish what occurred during this board interview. The attorney is asking, did you have a translator? That's it. Did you have a translator? Straightforward question. Now, we all know where this is going. We all know this is going to, I'm going to start asking you more questions. What's Petitioner's response multiple times? I was tired. I didn't know what was going on. Did you have a translator? I was tired. I didn't know what was going on. Did you have a translator? When an alien or a witness, any person testifying, is not answering questions, it's a legitimate basis to start questioning their credibility. And that's under the statute. Now we add in demeanor, responsiveness. Now we have the discrepancies in documents. Well, Petitioner says, well, they're not in the record. Straightforward. Arm, hand. Two different words. Well, in Pujabi slang, it's different. Except the document was in English. It's pure speculation. So then we have concerns about the other documents. The worker party on the letter. Why is the letterhead changed? Well, it's a small party. Who knows? First of all, that's not in the record. Petitioner never said, well, my party is a small part of this party. Well, they must change the letterheads. That's not in the record. That, again, is attorney argument, which is not evidence. And then we have the voter registration, which has them as a younger woman. Well, this is a difficulty. The government did not submit that evidence. The government didn't say, you must submit this evidence. He took this evidence and said, here you go, immigration judge. Here you go, fact finder. Take a look at this evidence because it supports my claim. Now, what he wants to say now is, oh, excuse me, can I take this evidence back? No. Essentially, it's saying I publish a document to a jury and say, oh, I'd like the jury to take a look at this. And then, you know, you start looking at it and you say, with the witness, you say, oh, you know, there's some discrepancies here. You know what, can I unpublish that? No. Petitioner submitted these documents, never gave an explanation until on cross there starts being problems with responsiveness and demeanor. So what we have here is the totality of circumstances. We look at them. We don't parse them out one by one. And even if we did, petitioner essentially conceded now that demeanor is sufficient. And Syncower supports that. So looking at the totality of the circumstances, the record simply does not compel reversal of this adverse credibility determination. And the Respondent asks that the Court deny the petition for review. Thank you. Okay. Thank you. I'll give you a minute or so, maybe a minute for rebuttal. I think you were over your time before. Okay. Thank you. So just briefly, in terms of the supposedly nonresponsive testimony at page 172 and 173, that's the only area they identified. I think even from his account, it shows that it wasn't nonresponsive. He did speak, and like counsel said, it's clear what the government attorney was getting at. And the question was not did you have a translator, but did you understand the questions. And so he starts explaining his state of mind. I think that's perfectly responsive and certainly is not nonresponsive in a demeanor sense, maybe in an evidentiary sense of whether counsel could have objected, which counsel did not at the time. I'm certainly not saying that an I.J. should sort of interrupt and say, stop fidgeting or why are you fidgeting. I'm saying something as occurred in Huang where the I.J. said, I'm just noting for the record that this happened. I note for the record that he's moving his hands, you know, several inches and his bracelet is jangling and something like that. I think Huang supports that. As for the letterhead and the voter roll, regardless of why those things might have happened, they're clearly just the kind of typos that this court has held, even post real I.D., can't be any basis for an adverse credibility determination. Thank you. Thank you very much, counsel. The case just argued will be submitted.
judges: Wallace, Tashima, Watford